**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**February 11, 2022**

# In the Court of Appeals of Georgia

A21A1348. IN THE INTEREST OF M. B. et al., children.

PHIPPS, Senior Appellate Judge.

The mother of eleven-year-old M. B. and her nine-year-old brother, P. B., appeals from a juvenile court order modifying the disposition of M. B. and P. B., who had previously been determined to be dependent. The mother contends that the Whitfield County Juvenile Court ("Whitfield Court") erred by finding that the evidence was sufficient to support the placement of custody of the children with the Whitfield County Department of Family and Children Services ("Whitfield DFCS"). For the reasons that follow, we affirm.

M. B. and P. B. were found to be dependent by the Chatham County Juvenile Court ("Chatham Court") in 2017. The Chatham Court found that the mother suffered from a mental health condition that impairs her ability to provide proper parental care,

that she received social security benefits as a result of a depression diagnosis, and that she acknowledged she needs a higher level of mental health care than she was receiving through her then-current counseling. The Chatham Court also noted that the Chatham County Department of Family and Children Services ("Chatham DFCS") had conducted a parental fitness assessment of the mother and recommended a psychological evaluation, including personality testing for the condition of factitious disorder imposed on another. Although the Chatham Court found the children to be dependent, the court ordered custody and control of the children to remain with the mother subject to conditions placed upon her by the court. One such condition was that the mother undergo a psychological evaluation and comply with any recommendations arising out of the evaluation.

After the mother relocated to Whitfield County, the Whitfield DFCS filed a dependency complaint in February 2020 alleging that M. B. had not been to school in approximately six weeks and that the mother had reported to school and medical providers that M. B. had been injured while the family was running from a tornado.[1] The complaint also alleged that P. B. had been hospitalized over ten times for

---

[1] At the preliminary protective hearing, a supervisor with the Whitfield DFCS testified that there had been no tornado in the area on the date the mother claimed M. B. was injured.

suicidal/homicidal thoughts or actions, was at that time hospitalized in Savannah, and had not been receiving any mental health treatment or medication prior to his hospitalization. The Whitfield Court removed the children from the custody of the mother and placed the children in the custody of the Whitfield DFCS. Following a preliminary protective hearing, the Whitfield DFCS filed a petition alleging dependency in March 2020. The Whitfield DFCS also filed a motion requesting the court to order the mother to undergo a psychological evaluation. After a hearing, the Whitfield Court granted the Whitfield DFCS's motion.

On September 25, 2020, the Whitfield Court held a hearing to determine whether to modify the Chatham Court's disposition order.[2] During the hearing, with the agreement of the parties, the Whitfield Court dismissed the dependency petition filed in that court (because the children had already been determined to be dependent by the Chatham Court) but moved forward with the hearing on the issue of whether the disposition of custody should be changed.

At the September 25 hearing, an expert in the field of forensic psychology testified that she evaluated the mother and that her evaluation included reviewing

---

[2] In March 2020, the Chatham Court dependency proceedings were transferred to the Whitfield Court.

documents provided to her by the Whitfield DFCS and examining the mother, who provided additional documents. According to the expert, she performed various tests with the mother, including a basic personality assessment inventory, a child abuse potential inventory, a parenting stress inventory for both M. B. and P. B., and a psychopathic personality inventory. The expert also completed a mental status exam and an extensive interview of the mother.

The expert concluded that the mother has the condition known as factitious disorder imposed on another ("FDIA"), which was previously known as Munchausen syndrome by proxy. The expert's written evaluation described the disorder as follows:

> In this mental illness, a person acts as if an individual he or she is caring for has a physical or mental illness when the person is not really sick. The adult perpetrator who has the diagnosis (FDIA) directly produces or lies about illness in another person under his or her care, usually a child under 6 years of age. . . . People with FDIA have an inner need for the other person (often his or her child) to be seen as ill or injured. It is not usually done to achieve a concrete benefit, such as financial gain, although that may occur in some cases. People with FDIA are even willing to have the child or patient undergo painful or risky tests and operations in order to get the sympathy and special attention given to people who are truly ill and their families. Factitious disorders are considered mental illnesses because they are associated with severe emotional difficulties.

At the hearing, the expert described, in detail, the basis for her conclusion that the mother has factitious disorder imposed on another. She explained that there was a consistent pattern of the mother finding problems with P. B. from a young age. For example, by the time he was three years old, the mother had P. B. put on an attention deficit hyperactivity disorder ("ADHD") medicine, even though it is not usually administered to children until about the age of six. According to the expert, every time the mother had problems that she could not handle, the mother put P. B. in a mental hospital. The expert testified that the records show that each time P. B. was assessed by a child psychologist, reading specialist, or other educational evaluator, the evaluator described him as a "sweet child" who responded to adult attention and calmed down easily if he became upset. The expert noted that P. B. was not accepted to one particular program because his behavior was "too good." Furthermore, the expert testified that although P. B. was hospitalized over fifteen times during the five-year period he was in the mother's care, P. B. has not been hospitalized at all since he has been in foster care.

According to the expert, although the mother told her that P. B. "did not have a good cognitive level," a cognitive development assessor described P. B. as "demonstrating the cognitive and early academic skills expected of a child of his

age," and one of his teachers said P. B. "demonstrates the same level of cognitive skills as peers, if not a little more advanced."

Similarly, although the mother claimed that P. B. had severe hearing loss and needed to wear bilateral hearing aids, the expert testified that in both 2016 and after P. B. entered foster care, testing showed normal hearing in one ear and mild hearing loss in the other. According to the expert, a report indicated that when P. B. told his mother that he did not have hearing loss, she told him that he did. The expert characterized this a sign of factitious disorder imposed on another.

The expert noted that P. B.'s school records indicate that he was "always" hungry at school. According to the expert, the school was concerned because the mother said P. B. was on a special diet, and she would send lunches to school with him in a locked lunch box, explaining that she did not want him eating his food before lunchtime. The expert testified that teachers took the locks off the lunch box and let P. B. have the food. In fact, school personnel started feeding him more and different food, which made the mother very angry. The mother claimed, on the other hand, that P. B.'s school requested that she lock his lunch box so he could not sneak food on the bus; she explained that she was a food blogger and because he saw her taking pictures of his lunch every day, he really looked forward to what he had to eat

6

and he started eating his lunch before lunchtime and not having any food after that. Notably, when P. B. first arrived in foster care, he hoarded food; his foster parents would find hundreds of food wrappers under his bed and in his laundry. Consequently, P. B.'s foster family worked hard to teach him that he was going to get as much food as he wanted, and P. B.'s food hoarding has subsided in the time that he has been in foster care.

The expert also testified that the mother said P. B. had major allergies, including an allergy to peanuts. In fact, at one point, when he got near peanuts, the mother injected him with epinephrine, using an auto-injector, and then took him to the hospital, but the hospital found no indication of an anaphylactic response. According to the expert, after P. B. came into foster care, allergy tests showed that he has only mild allergies.

Regarding M. B., the expert testified that when M. B. was an infant, she was diagnosed with an unusual disorder that caused her to "spit up" and "go rigid." The disorder was diagnosed the first time the mother took M. B. to an emergency room, but the mother brought M. B. back to the emergency room with similar symptoms many times. According to the expert, although the mother reported that M. B.'s

7

symptoms were getting worse, hospital personnel detected no worsening of symptoms.

The expert determined that the family has five of the seven basic criteria for a diagnosis of factitious disorder imposed on another in the mother: (1) a history of hospitalizations of the children; (2) worsening of the children's symptoms as reported by the parent but not witnessed during hospital stays; (3) a mismatch between the children's reported conditions and symptoms and the results of testing; (4) one or more unusual illnesses or deaths of children in the family; and (5) an improvement of the children's conditions in the hospital, with symptoms reoccuring when they return home. The expert found that the other two criteria for a diagnosis of factitious disorder imposed on another are not present – blood in lab samples not matching the blood of the children, and signs of chemicals in the children's blood, stool, or urine.

The expert explained that treating factitious disorder imposed on another is difficult because those with the disorder often deny there is a problem, and successful treatment is dependent on catching the person in the act or the person telling the truth. The expert testified that the mother's disorder had harmed the children by subjecting them to unnecessary medical procedures, hospitalizations, hunger, potential malnutrition, and psychological abuse. According to the expert, the psychological

8

harm caused to children by factitious disorder imposed on another is intense and "not easily gotten over."

The children's foster parent also testified at the hearing. According to the foster parent, "it was rough" when M. B. and P. B. first came to live with his family, but they are now "doing pretty well."

At the hearing, the mother testified she did not know the medical details related to P. B.'s hearing issues because she was in prison when he was born and he was then cared for by his father and his grandmother. According to the mother, P. B. failed his newborn hearing test, and his diagnoses varied between hearing loss in one ear and hearing loss in both ears.

The mother testified that, when she got out of prison, P. B. was two-and-a-half years old and was "delayed language-wise," "had sensory issues," and was "kind of hyper." She claimed that P. B. was put on ADHD medication when he was three-and-a-half years old based on a doctor's recommendation. The mother testified that P. B. was first hospitalized after he tried to stab M. B. with a pair of scissors in 2016. According to the mother, he was hospitalized many times after that for running in traffic or jumping out of a car.

Based on the evidence presented at the hearing, the Whitfield Court found that the mother has factitious disorder imposed on another[3] and that the disorder has adversely affected both children, especially P. B. The Whitfield Court concluded that the findings from the mother's psychological evaluation constituted changed circumstances that required a modification of the disposition order. Consequently, the Whitfield Court modified the disposition order to vest temporary custody of the children in the Whitfield DFCS, with supervised visitation by the mother. This appeal followed.

We review a juvenile court's modification of disposition for abuse of discretion. See *In the Interest of J. N. F.*, 306 Ga. App. 313, 315 (701 SE2d 925) (2010). "There can be no abuse of discretion if there was any evidence to support the ruling of the juvenile court." Id.

In her sole enumeration of error, the mother contends that the Whitfield Court erred by finding the evidence sufficient to support the placement of custody of the children with the Whitfield DFCS. Specifically, the mother contends that (1) her testimony refuted the testimony of the expert, (2) she "loves her children and has

_____

[3] Although the Whitfield Court's order used the term "Factitious Disorder," in context, it is clear that the court was referring to factitious disorder imposed on another.

10

taken good care of them," and (3) she showed "substantial credibility both as a person and a mother by the detailed and knowledgeable testimony that she provided." She argues that the Chatham Court did not find the mother a threat to the children and allowed them to live with her and that the Whitfield Court "abused [its] discretion in failing to allow the children to live with their mom" and making a custody decision that was "not in accordance with [the decision of the Chatham Court]."

The Whitfield Court had the authority to modify the earlier disposition order based on changed circumstances if doing so would be in the best interest of M. B. and P. B. See OCGA § 15-11-32 (b) (an order of the juvenile court may be "changed, modified, or vacated on the ground that changed circumstances so require in the best interests of a child[.]"); *In the Interest of H. G. D.*, 342 Ga. App. 651, 653 (1) (803 SE2d 788) (2017) (juvenile court had authority to modify custody of dependent children where it determined that the safest placement of the children would be in DFCS custody). On appeal, this Court does not determine witness credibility but instead defers to the factual findings made by the juvenile court. *In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018). Despite the mother's argument, the Whitfield Court's finding that the mother has factitious disorder imposed on another and that the disorder has adversely affected both children is

11

supported by the record. Furthermore, although the Chatham DFCS had recommended that the mother be evaluated for factitious disorder imposed on another, the mother had never been diagnosed with the disorder until she was evaluated by the expert who testified at the Whitfield Court hearing on modification of disposition. Thus, the evidence in the record regarding the mother's diagnosis and her behavior consistent with that diagnosis supports the Whitfield Court's conclusion that changed circumstances require a modification of the disposition order.

*Judgment affirmed. Rickman, C. J., and McFadden, P. J., concur.*